**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**DONNA FLOYD-GIMON**                                                              **PLAINTIFF**

**V.**                                          **NO. 4:10CV00655 JMM**

**UNIVERSITY of ARKANSAS for MEDICAL SCIENCES by
and through THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ARKANSAS; JOHN ED ANTHONY,
CARL JOHNSON, JANE ROGERS, SAM HILBURN,
MIKE AKIN, JIM VON GREMP, JOHN TYSON, BEN
HYNEMAN, DAVID PRYOR, and MARK WALDRIP
in their official capacity as members of the Board of Trustees
of the University of Arkansas; MARY HELEN FOREST,
in her personal capacity; CHARLES WHITE,
in his personal capacity; R.T. FENDLEY, in his personal
capacity, and RICHARD PIERSON, in his official
and personal capacity**                                              **DEFENDANTS**

<u>**ORDER**</u>

Pending are Defendants' motion for judgment on the pleadings, docket # 11, motion for

summary judgment, docket # 33 and second motion for summary judgment on requested relief

and official capacity claims, docket # 40.  Plaintiff has responded to each motion and Defendants

have filed replies.  For the reasons set forth herein, Defendants' motion for judgment on the

pleadings is GRANTED IN PART AND DENIED IN PART.  Defendants' motion for summary

judgment is GRANTED.  Defendants' second motion for summary judgment is DENIED AS

MOOT.

<u>Facts</u>

Plaintiff, Donna Floyd-Gimon ("Floyd" or "Plaintiff")  filed her lawsuit against the

Defendants pursuant to 42 U.S.C. §1983 on June 15, 2010.  Plaintiff alleges that UAMS and its

officials deprived her of a property interest in her employment and her liberty interest in her

professional reputation by terminating her without adequate notice or an opportunity to address

the charges.  Plaintiff also alleges gender discrimination in violation of federal equal protection provisions and the Arkansas Civil Rights Act and defamation under state law.  Plaintiff seeks declaratory and injunctive relief, reinstatement, back pay, front pay, and compensatory damages.

UAMS is a liver transplant hospital that registers transplant patients onto a national database that determines liver allocation.  The United Network for Organ Sharing ("UNOS") manages the national database.  Liver allocation is based on the patient's status and the UNOS scoring system.  The scoring system prioritizes patients by the most urgent need for a transplant. The national database is called UNET.

UAMS liver transplant coordinators are responsible for inputting the patient's lab test results onto UNET.  Floyd was one of two liver transplant coordinators at UAMS.  Sue Belcher ("Belcher") was the other coordinator.  As a coordinator, Floyd was responsible for maintaining and monitoring her patients' health information, reviewing their labs and accurately entering their medical data onto UNET.   UNOS sets deadlines for updating patient health information. Floyd was responsible for monitoring the UNOS deadlines for her assigned patients.  If the lab results were not provided within the UNOS prescribed deadline, the patients' score would drop regardless of their medical condition potentially jeopardizing their status on the transplant list.

Courtney Bryant ("Bryant") was Floyd's and Belcher's assistant.  Bryant was not a nurse and assisted Floyd with scheduling tests and retrieving lab work.  Bryant had no responsibility for monitoring patient health.  Bryant, Floyd and Blecher shared an office.  Ann Butts ("Butts") and Sue Weeks ("Weeks") were Floyd's immediate supervisors.  R.T. Fendley ("Fendley") is the Senior Associate Hospital Director and Butts supervisor.  Fendley made the decision to terminate Floyd's employment.  Defendants claim that Fendley's termination decision was made in

consultation with Floyd's supervisors and the UAMS Medical Records Compliance Department investigators.  Pierson is Fendley's supervisor and is the Vice Chancellor for Clinical Programs.  Pierson approved Floyd's termination in consultation with Findley.  White is the Assistant Vice Chancellor for Employee Relations and he administers the grievance process.  White was not involved in the decision to terminate Floyd. Forrest is the Chief Nursing Officer ("CNO") at UAMS and she oversees nursing practice quality and compliance with Arkansas State Board of Nursing ("ASBN") regulations.  Forrest did not participate in the decision to terminate Floyd or the grievance process.  Forrest reported Floyd's termination to the ASBN.

Beginning in the fall of 2007 and continuing through mid-2008, UNOS audited the transplant program.  The audit was to verify the accuracy of patient medical data entered onto UNET.  On September 19, 2007 and again on February 8, 2008,  UNOS requested source documentation to verify several data entries that Floyd made on certain patients.   In the fall of 2007, Floyd and Belcher decided that Belcher would compile the source documentation to respond to the UNOS request. Belcher was not familiar with Floyd's patients on a day to day basis and did not know where Floyd's patients had their labs drawn.  Floyd does not remember if Belcher asked her for information about her patients to locate source documents, but testified in her deposition that it is possible and reasonable to assume that she did.

On April 18, 2008, Floyd received a call from Weeks informing her that UNOS still had questions concerning the audit.  Weeks asked Floyd about specific lab results and other documents for certain patients.  Floyd informed Weeks in this telephone conversation that she did not have any charts or records with her as she was at her mother's funeral.  Floyd asked Weeks when the information needed to be completed and was told that it had to be completed by

the end of the following week.  The week of April 21, 2008, Floyd recalls being asked about lab

results for patient MM, (Floyd Dep. 75:9-77:24, February 3, 2011, ECF No. 36), and may have

been asked about other patients. (*Id*. at 77:25-81:25).   Floyd was aware of the importance of

finding the source documents for the UNOS audit.  (*Id*. at 108:8-9).  Plaintiff recalls receiving

emails from Weeks and Butts on April 18 and 19 regarding the audit but she did not read them.

Belcher informed Floyd that she talked to Weeks and the records and justifications requested by

UNOS had to be completed and returned to UNOS by April 25.  Belcher told Floyd that pursuant

to Weeks instruction, Belcher would make the UNOS request her top concern and Floyd was to

manage the clinic on April 21 and 22.  Belcher advised Floyd that Weeks, Butts and Belcher

would meet on April 24 to review the additional information prior to its submission to UNOS.

On April 24, 2008, Belcher gave Weeks the liver transplant department's response to the

UNOS audit.  Belcher represented, in Floyd's presence, that they found all of the source records

that UNOS requested to verify their UNET entries.  Belcher mentioned only one exception. Later

in the day, Weeks and Butts performed a review of the audit response and discovered several

discrepancies.  Weeks and Butts attempted to locate the actual records for one of Floyd's patients

and in the course of the search, numerous patient records were found that had been physically cut

and altered in a shred bin under Belcher's desk and in another large shred bin.  Several of the

altered records were of two of Floyd's patients.  Butts reported this discovery to her supervisor,

Fendley, and Weeks notified Forrest.

On April 25, 2008, Floyd was told that there were "grave errors" and "discrepancies in

the records and that some actual alterations of records were found."  It was also mentioned to

Floyd that cut and pasted documents had been discovered.  Floyd and Belcher met with Findley,

Butts and Weeks on April 25 and both were placed on administrative leave.

UAMS Institutional Compliance Officer Hohn and UAMS Family Group Compliance Officer Paula Alonso investigated the events.  Although the extent of the investigation is disputed, it is undisputed that the investigators reviewed medical records and data systems.  The investigators looked at the values that were entered onto UNET and reported to UNOS.  Further, they reviewed medical charts to determine if source documents for the entries existed.  They investigated who made the data entries and verified entries with the UAMS IT department.  Although not included in the Compliance report, the investigators concluded that Floyd and Belcher participated in a scheme to intentionally alter or cut and paste medical records for the UNOS audit to cover-up for a lack of source documents.  (Hohn Dep. 161:3-25, February 1, 2010, ECF No. 53).

Floyd admits that she met with Hohn and Alonso on April 29, 2008.  Although she does not remember everything that was asked, she admits that she was asked about the policy for keeping source documents and about a document that had been cut and pasted with Belcher's name on it.  Floyd denied any knowledge of anyone cutting and pasting documents or altering any patient records.  Floyd asked to see documents numerous time, but was denied the opportunity.  Floyd also stated that she did not review any of the documents that were included in the response before Belcher gave the documents to Weeks to send to UNOS.

On May 9, 2008, Floyd met with Fendley, Butts and Dr. Nick Lang.  She was told that the investigators had found errors in her lab entries and the chart audit revealed altered medical records.  Floyd denied any knowledge or involvement and claims that the comments made to her were general, except for one reference to a patient that the records demonstrated had labs run on

5

one day and the report indicated a different date.  Floyd was not allowed to see any documents.

On May 9, 2008, Floyd was terminated for gross misconduct and was given a termination letter.

Floyd's termination letter, signed by Butts and Fendley, stated:

> As a result of findings during a routine audit by the United Network for Organ Sharing (UNOS), the regulatory body for transplant programs, UAMS launched a compliance audit of patient records maintained by this employee.  The compliance audit is ongoing.  To date, multiple instances have been found of this employee entering incorrect data into the UNOS data base, and multiple instances have been found in which patient records were altered by this employee.  Such behavior constitutes gross misconduct, and is grounds for immediate termination.

(Floyd Dep. at Ex. 14).  Floyd signed the termination letter and checked the box indicating that

she read the above statement, but disagreed with it.

On May 16, 2008, Floyd filed a grievance with White.  Floyd complained about the

process she was provided.  White requested that Pierson provide a response to Floyd's grievance.

Pierson asked Fendley to draft a letter for his signature.  On June 3, 2008, Pierson authored a

memorandum to White finding that based on his review Floyd's termination was justified.

Pierson concluded:

> Upon reviewing the facts, it is clear that Ms. Floyd-Gimon participated in the alteration of patient records.  It does not appear that mal-intent was involved.  Rather, it appears there was a general sloppiness in maintaining patient records and, when discovered, there were numerous acts of record alteration in order to cover up the inadequate record maintenance.  Given the nature and magnitude of the falsifications, this was nothing short of gross misconduct potentially affecting not only patients' lives, but the ongoing viability of the UAMS Liver Transplant Program.

(*Id*. at Ex. 16).  Pierson specifically outlined three alterations found, noting that the examples

were provided as an illustration, and only a sample of the record alterations found.  On June 6,

2008, White notified Floyd of the result of the investigation.  He communicated his finding that

6

her termination was appropriate and in accordance with established UAMS administrative

guidelines, and denied her grievance.  (*Id*. at Ex. 17).

On May 22, 2008, Forrest, in her capacity as the CNO for UAMS, sent a letter to the

ASBN advising as follows:

> This serves to notify you of the termination of employment from UAMS Medical
> Center of Donna Floyd-Gimon, RN and [Belcher], RN.  Both RNs were
> discovered to be intentionally altering patient medical records to produce source
> documents needed to respond to a routine care-related audit.

(Forrest Aff., Ex. E-2, March 23, 2011, ECF No 36).

Plaintiff does not dispute that she was terminated from UAMS and that UAMS

determined that she intentionally altered patient medical records to produce source documents

needed to respond to a routine care-related audit.  (Floyd Dep. at 149:1-150:2).   On August 21,

2009, Plaintiff received a "Letter of Warning" from the ASBN.  The "Letter of Warning" was not

a formal disciplinary action and could not be appealed.  The letter stated, "While employed at

UAMS you failed to accurately document into patient's medical record laboratory and diagnostic

findings."  (Floyd Dep. at Ex. 20).  William F. "Fred" Knight, the General Counsel for the

Arkansas State Board of Nursing, stated in his affidavit that after reviewing the investigation of

the complaint against Plaintiff, he determined that there was insufficient evidence to proceed to a

hearing and recommended that the investigation be closed without discipline.  (Knight Aff., July

26, 2011, ECF No 53).  The Letter of Warning was not reported to any interstate or national data

bank.  However, the initial complaint against the Plaintiff and the information in the investigative

files, with the exception of patient records and patient information is public information and is

subject to the Arkansas Freedom of Information Act.

On November 14, 2008, Plaintiff filed a claim against the State of Arkansas with the Arkansas Claims Commission.  Plaintiff alleged breach of contract, wrongful termination and defamation.  Plaintiff was granted a non-suit of her claim on June 10, 2010.

<u>Standard for Summary Judgment</u>

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues.  *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979).  The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set

> forth affirmative evidence, specific facts, showing that there is a
> genuine dispute on that issue.  If the respondent fails to carry that
> burden, summary judgment should be granted.

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted)(brackets in original)).  Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

The Eighth Circuit Court of Appeals has recently clarified:  "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Togerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011).

Discussion

<u>Sovereign Immunity</u>.

Plaintiff's Section 1983 claims against UAMS, the Board and all damages claims against the individual defendants in their official capacities are barred by Eleventh Amendment Immunity. The Supreme Court has held that the Eleventh Amendment extends to preclude suits against a state, state agency, entity or institution by its own citizens as well as citizens of another state or citizens of any foreign state.  *Edelman v. Jordan,* 415 U.S. 651 (1974), *Alabama v. Pugh*, 438 U.S. 781 (1978).  Additionally, the Eleventh Amendment prohibits federal court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially for the recovery of money from the state.  *Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459 (1945), *overruled on other grounds* by *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia*, 535 U.S. 613 (2002).  Moreover, the Supreme Court has held that

"neither a State nor its officials acting in their official capacities are 'persons' under §1983"

when sued for damages. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

"UAMS is merely a department of the University of Arkansas and, as such, is not an entity that

can sue or be sued." *Univ. of Ark. for Med. Sciences v. Adams*, 354 Ark. 21, 25, 117 S.W.3d 588,

591 (Ark.2003) (dismissing a state medical malpractice action); see also *Assaad-Faltas v. Univ.*

*of Ark. for Med. Sciences*, 708 F.Supp. 1026, 1029 (E.D.Ark.1989), aff'd 902 F.2d 1572 (1990)

(dismissing a § 1983 action). Thus, Plaintiff's §1983 claims against UAMS, the Board and the

individual Defendants in their official capacities to recover damages are dismissed.

State officials are "persons", however,  under §1983 when sued for injunctive relief and

the Eleventh Amendment does not bar such relief. *Will v. Michigan Dep't of State Police*, 491

U.S. 58, 71 (1989). In addition, the Eleventh Amendment does not prohibit a suit for damages

against a state officer in his individual capacity.  *Nix v. Norman,* 879 F.2d 429, 432-33 & n. 3

(8th Cir.1989).

<u>Property Interest Claim</u>

Plaintiff claims that she had a property interest in her position and was thus entitled to

procedural due process prior to her termination.  To prevail on her claim, Floyd must establish

that she had a protected property interest in her employment and that she was deprived of that

interest without due process.  *Cleveland Bd.of Educ. v. Loudermill*, 470 U.S.532, 538 (1985).

The Court must look to state law to determine if Floyd had a protected property interest in her

employment.  *Eddings v. City of Hot Springs, Ark.*, 323 F.3d 596 (8th Cir. 2003).  As a public

employee, Floyd had a property interest in her employment with UAMS only if there were

"contractual or statutory limitations on the employer's ability to terminate an employee," such as

a contractual right to be terminated only for cause. *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir.1994).  Arkansas is an at-will employment state. *Magic Touch Corp. v. Hicks*, 99 Ark. App. 334, 335-36, 260 S.W.3d 322, 324 (2007). "[A]n at-will employee may be discharged for good cause, no cause, or even a morally wrong cause." *Smith v. American Greetings Corp.*, 304 Ark. 596, 597,804 S.W.2d 683, 684 (1991).

The Honorable J. Leon Holmes recently examined whether an employee with UAMS had a property interest in her employment.  *Drye v. Univ. of Ark. for Med. Scis. ex rel.*, 2011 WL 4434232 (E.D.Ark. 2011).  Counsel for Floyd also represented the plaintiff in Drye and made the same arguments including citations to the same deposition of UAMS Assistant Vice Chancellor White in support of the plaintiff's position.  The Court agrees with the analysis of Judge Holmes.

Floyd argues that the "at will" employment status at UAMS was only effective during an employee's probationary period.  However, the UAMS Staff Handbook states that "[e]mployment with the University of Arkansas System is governed by an Employment-at Will doctrine" and "[s]taff employees may be terminated at any time . . . . " (Bradley Aff., Ex. F-1, March 21, 2011, ECF No. 36).  The handbook also provides that an employee may be dismissed for cause, but does not limit termination to those instances where cause exists. (*Id.*).  Floyd relies on the deposition of Charles White to support her position that the employment at will status applied only during an employee's probationary period.  Although White testified that "at will is invoked during the probationary period."  (White Dep. 27:6-18, December 7, 2009, ECF No. 53 and 60), he also testified that "UAMS is an at will employer.  You work for the state.  You do not have the right to work for state government.  State government is an at-will employer.  They can let you go at will."  (*Id.* at 24:25-25:3).  White did not limit the applicability of "at-will"

employment to the probationary period only.

The Court finds that Plaintiff was an at-will employee.  Accordingly, Plaintiff had no protected property interest in continued employment.  Thus, summary judgment is granted as to Plaintiff's property interest claims.

<u>Liberty Interest Claim</u>

Plaintiff claims that UAMS and its officials deprived her of a liberty interest in her professional reputation by terminating her without adequate notice or an opportunity to address the charges.  An "employee is entitled to procedural due process only when he has been deprived of a constitutionally protected ... liberty interest." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir.1994). "An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Id*.  "To establish an unconstitutional liberty interest deprivation, the plaintiff must establish that: (1) [s]he was stigmatized by the statements; (2) those statements were made public by the administrators; and (3) [s]he denied the stigmatizing statements." *Rush v. Perryman,* 579 F.3d 908, 912-913 (8th Cir. 2009).

Plaintiff argues that Forrest's report to the ASBN establishes the publication requirement. The Court disagrees.  Forrest's communication with the ASBN was made in her official capacity as chief nursing officer, based upon information provided to her by R.T. Fendley, in compliance with the Nurse Practices Act, which requires reporting in certain circumstances.  *See, Hogue v. Clinton*, 791 F.2d 1318 (8th Cir. 1986)(finding that referring charges to the Prosecuting Attorney did not constitute publication because the information was given to the prosecutor in his capacity

as a public official).  *See also, Durham v. Stegman*, 1994 WL 326757(D. Kan. 1994)(finding

that the defendant did not disclose stigmatizing information publically where the information was

turned over to the Kansas State Board of Nursing).   Plaintiff failed to present evidence that the

statements were made public as required to establish her liberty interest claim. Accordingly,

summary judgment is granted as to Floyd's liberty interest claims.

ACRA and Equal Protection Claims

The McDonnell Douglas burden-shifting framework governs plaintiff's gender

discrimination claims. *Lockridge v. Board of Trustees of the University of Arkansas*, 315 F.3d

1005, 1013 (8th Cir. 2003); *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214 (8th Cir.1990)

(McDonnell Douglas test has been used to evaluate a plaintiff's prima facie showing of

discrimination for both § 1981 and § 1983 claims); *Davis v. KARK-TV, Inc.*, 421 F.3d 699 (8th

Cir.2005) (Title VII disparate treatment claims, § 1981 claims, and ACRA claims analyzed in the

same manner).

Plaintiff argues that the strength of her evidence rises to the level of direct evidence and

makes out a case under McDonnell Douglas.  Direct evidence of discrimination is "evidence

showing a specific link between the alleged discriminatory animus and the challenged decision,

sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually

motivated the adverse employment action." *McCullough v. Univ. of Ark. for Med. Scis* , 559 F.3d

855, 860 (8th Cir. 2009)(quoting *Russell v. City of Kansas City*, 414 F.3d 868, 866 (8th Cir.

2007)). Direct evidence is distinguished from "stray remarks in the workplace, statements by

nondecisionmakers, or statements by decisionmakers unrelated to the decisional process."

*Clearwater v. Indep. Sch. Dist. No. 166,* 231 F.3d 1122, 1126 (8th Cir. 2000).   Plaintiff claims

that the deposition testimony of White establishes direct evidence of discrimination.  Plaintiff

states that White testified that although he might be entitled to a hearing, he thought that the

Plaintiff was not because, "I'm male.  We're different."  (White Dep. 57: 23-25, December 7,

2009, ECF No. 53 and 60).  The entire dialogue at page 56-58 is as follows:

Q.      And you're telling me that if you yourself was accused of falsifying some
        documents that led to your dismissal at UAMS, you don't think it would be fair to
        allow you to be - - to see those actual documents and either admit or deny that you
        did it?
A.      It would be fair, I think we should let them have them.
Q.      I'm talking about you.  Let's assume you are accused of that.  Do you think you
        would want to see the documents that you have been accused of falsifying?
A.      I'd ask to see them, yes.
Q.      And they asked to see them, didn't they?
A.      I think they did.
Q.      And they didn't get to see them, did they?
A.      I don't think they did.
Q.      Okay.   So why would you want to see them if you are being fired for falsifying
        documents, but you don't think they should have seen them?
A.      I'm me and they are them.
Q.      What's the difference?
A.      We're different.
Q.      Why are you different?
A.      Because we are.
Q.      Why?  Give me how you're different.
A.      I'm different in that I am 80.  I don't know how old they are.  They are male - - I
        mean, they are female and I'm male.  We're different.
Q.      Any other differences?
A.      We are all human beings, but we are different.
Q.      Any other differences? You've given me age and you've given me sex.
A.      Not that I can think of.
Q.      So let me ask you in your job here at UAMS, if you were accused of falsifying
        documents in your role, would you be afforded the same grievance procedure or
        process that these two ladies would have been afforded?
A.      Yes.
Q.      Same Process?
A.      Yes.
Q.      So you would have a right to file a grievance; is that right?
A.      Yes.
Q.      And you would have the right to a hearing - -
A.      No.

14

Q.      –if somebody in your role made that decision?

A.      No, I wouldn't have the right to a hearing.  I don't understand the question "hearing".  In terms of a review, the employee does not have the right to have a panel appointed.  They may have appointed, not that they will, they may.

(Id. at 56:25-58:23).  Mr. White did not testify that gender was a factor in Plaintiff's termination. In fact, he testified that he would have been afforded the same grievance process as that afforded Plaintiff.  White was not involved in the decision to terminate Plaintiff.  Plaintiff complains that White affirmed her termination without referring the matter to a grievance panel.  White testified that even he would not have the right to have a panel appointed.  The Court finds that Plaintiff's evidence in support of her gender discrimination claim does not constitute direct evidence of discrimination.   The evidence offered does not provide a specific link between Floyd's gender and her termination sufficient to support a finding by a reasonable fact finder that gender actually motivated the adverse employment action.

Because Plaintiff presents no direct evidence of discrimination, the Court will apply the analytical framework set forth in *McDonnell Douglas.*  Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McGinnis v. Union Pacific R.R. Co.*, 496 F.3d 868, 873 (8th Cir. 2007).  The plaintiff's successful establishment of a *prima facie* case creates a presumption of unlawful discrimination and shifts the burden to the defendant, who must then articulate a legitimate, nondiscriminatory reason for its actions. *Id.* Finally, if the defendant proffers such a reason, the plaintiff must then show that the defendant's proffered reason is merely a pretext for discrimination. *Id.*

To meet her burden of showing a prima facie case of gender discrimination, Floyd must show (1) she was a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was treated differently than similarly situated

males or there is some other evidence that would give rise to an inference of gender

discrimination. *Holland v. Sam's Club,* 487 F.3d 641, 644 (8th Cir. 2007); *Turner v. Gonzales,*

421 F.3d 688, 694 (8th Cir. 2005).

Floyd's termination letter states that she was terminated for gross misconduct. The letter,

signed by Butts and Fendley, stated:

> As a result of findings during a routine audit by The United Network for Organ
> Sharing (UNOS), the regulatory body for transplant programs, UAMS launched a
> compliance audit of patient records maintained by this employee. The compliance
> audit is ongoing. To date, multiple instances have been found of this employee
> entering incorrect data into the UNOS data base, and multiple instances have been
> found in which patient records were altered by this employee. Such behavior
> constitutes gross misconduct, and is grounds for immediate termination.

(Floyd Dep. at Ex. 14). On May 16, 2008, Floyd filed a grievance with White. Floyd

complained about the process she was provided. White requested that Pierson provide a

response to Floyd's grievance. Pierson asked Fendley to draft a letter for his signature. On June

3, 2008, Pierson authored a memorandum to White finding that based on his review, Floyd's

termination was justified. Pierson concluded:

> Upon reviewing the facts, it is clear that Ms. Floyd-Gimon participated in the
> alteration of patient records. It does not appear that mal-intent was involved.
> Rather, it appears there was a general sloppiness in maintaining patient records
> and, when discovered, there were numerous acts of record alteration in order to
> cover up the inadequate record maintenance. Given the nature and magnitude of
> the falsifications, this was nothing short of gross misconduct potentially affecting
> not only patients' lives, but the ongoing viability of the UAMS Liver Transplant
> Program.

(*Id*. at Ex. 16). Pierson specifically outlined three record alterations found, noting that the

examples were provided as an illustration, and only a sample of the alterations discovered. On

June 6, 2008, White notified Floyd of the result of the investigation. He communicated his

16

finding that her termination was appropriate and in accordance with established UAMS

administrative guidelines, and denied her grievance.  (*Id*. at Ex. 17).

The termination letter, in addition to Pierson's memorandum to White set forth the

legitimate business reason for Floyd's termination.   Because the Defendants have proffered a

legitimate, nondiscriminatory reason for the adverse employment action taken against Floyd and

Floyd has presented "whatever evidence she had to show that the proffered reason was a pretext

for discrimination," this Court will focus on the pretext stage of the *McDonnell Douglas*

burden-shifting framework. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 856 (8th Cir. 2005)

(Colloton, J., concurring).

Defendants provided a legitimate, nondiscriminatory reasons for its employment decision.

Courts are not permitted to second-guess an employer's personnel decision or to correct an

unwise decision if the employer gives an honest, nondiscriminatory explanation for its decision.

*Gill v. Reorganized Sch. Dist R-6*, 32 F.3d 376, 379 (8th Cir. 1994) *abrogated on other grounds*

by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir.2011) (en banc).   Defendants state

that Floyd was terminated because multiple instances were found where she entered incorrect

data into the UNOS data base, and multiple instances were found where she altered patient

records. Even if the decision makers were wrong in their conclusions, there is still no basis for

recovery for discrimination.   *Scroggins v. Univ. of Minn*, 221 F.3d 1042, 1045 (8th Cir. 2000)

(the relevant inquiry is whether the defendant believed the plaintiff was guilty of the conduct

justifying the discharge, not whether he was actually guilty).  *See also McCullough v. Univ. of*

*Ark. for Med. Scis*, 559 F.3d at 862 ("A plaintiff seeking to survive an employer's motion for

summary judgment must therefore show a genuine issue for trial about whether the employer

acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination.").

Floyd argues that the evidence supports a finding that the Defendants' reason for her termination is pretext for gender discrimination.  First, Floyd argues that the Defendants failed to follow its own policies when she was terminated without any notice or an opportunity for a hearing. Floyd's argument that White's testimony supports a finding that unlawful discrimination occurred is unfounded as he specifically stated that he would have been afforded the same grievance process as that provided to Floyd.  Further, even if a violation of policy occurred, "a violation of UAMS policy, in and of itself, does not support a finding that [the plaintiff] was fired on account of [her] sex."  *Id.* at 863.  *Haas v. Kelly Servs., Inc*., 409 F.3d 1030, 1036 (8th Cir.2005) ( An employer "can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so.").

 Second, Floyd argues that there is evidence that similarly situated employees were treated differently.  Specifically, Floyd points to Courtney Bryant who worked in the same area as Floyd but was not terminated.  Floyd also points to two male employees who were terminated for records falsification, but were not reported to the ASBN, and several males who were reported to the ASBN but were not terminated for their misconduct.   Plaintiff argues that Dr. Weiss was found guilty of misconduct in providing a supplemental source document in response to the UAMS audit, yet was not disciplined.  Finally, Plaintiff argues that the investigation and hearing afforded Dr. Wu shows discriminatory animus.

18

At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one," requiring the plaintiff to show that he and the other candidates are "similarly situated in all relevant respects."  *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir.2005) *abrogated on other grounds* by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir.2011) (en banc).

The fact that Courtney Bryant, who worked in the same area as Plaintiff, was not terminated is of no consequence to Plaintiff's gender discrimination case, as Ms. Bryant is also female. *See E.E.O.C. v. Kohler Co.,* 335 F.3d 766, 776 (8th Cir.2003)("A plaintiff may prove allegations of disparate treatment by demonstrating that he was treated less favorably than similarly situated employees outside the plaintiff's protected class").  Plaintiff also relies upon two males who were terminated for records falsification, but were not reported to the ASBN as comparators.  However, these two individuals were terminated for time records falsification.  A fundamental difference exists between the conduct supporting the Plaintiff's termination, the multiple instances of intentional alteration of patient records which potentially jeopardized patient's lives and the transplant program itself, and time record falsification.  "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness" to the plaintiff's conduct. *Rodgers,*417 F.3d at 853. Further, there is no evidence that these individuals were similarly situated to the Plaintiff in all relevant respects, as these individuals did not work under the same supervisor, work in the same department or have the same responsibilities as Floyd.  *See Hervey v. County of Koochiching*, 527 F.3d 711, 720 (8th Cir.2008) ( "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating

or distinguishing circumstances.") *(quoting Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000)),

*cert. denied*, 555 U.S. 1137(2009)

      Plaintiff complains that Dr. Weiss and Dr. Wu received favorable treatment during the

compliance investigation.  Neither Dr. Weiss nor Dr. Wu are similarly situated to the Plaintiff

nor were they accused of misconduct of comparable seriousness and disciplined more leniently

than Floyd.   Plaintiff points to the deposition of Jane Hohn wherein she states that Dr. Weiss

rewrote his own medical report to reflect a tumor size of 2 centimeters at the request of Sue

Belcher. Ms. Hohn states that she reported this conduct to Dr. Lang.  First, Dr. Weiss is a

physician, not a nurse, and is not subject to the same job duties, supervisors or decision makers

as Plaintiff.  Second, even if Dr. Weiss rewrote his own report, the conduct is not of comparable

seriousness to the misconduct of Plaintiff wherein she was found to have committed numerous

acts of record alteration in order to cover up the inadequate record maintenance.  Plaintiff alleges

that Dr. Wu was allowed to walk out of the compliance interview and call his attorney.  There is

no evidence that Dr. Wu engaged in misconduct or falsified medical records.

      Plaintiff points to male employees who were reported to the ASBN but were not

terminated.  These  individuals were reported to the ASBN for misconduct including narcotic and

other drug use and a complaint, which was found to be invalid on investigation, which involved a

conflict between a patient and an employee where the patient accused the employee of "pulling a

knife" on a co-worker.  There is no evidence that these individuals are similarly situated in all

relevant respects, as these individuals did not work under the same supervisors, work in the same

department or have the same responsibilities as Floyd nor were they accused of the multiple

instances of misconduct as was Floyd.

Plaintiff also points to two employees who received written warnings but were not terminated after a sexual harassment complaint by another employee and  an incident in which an employee referred to a patient as a "retard."   Again, there is no evidence that these individuals are similarly situated in all relevant respects, as these individuals did not work under the same supervisors, work in the same department or have the same responsibilities as Floyd nor were they accused of the multiple instances of misconduct as was Floyd.  The Court finds that Floyd's purported evidence of disparate treatment fails to meet the rigorous test applied at the pretext stage for deciding whether employees who were treated differently from the plaintiff were similarly situated.

 Floyd argues that the Defendants' reasons for her termination have changed over time. The Court disagrees.  Floyd's termination letter stated that her termination was based on findings of multiple instances of Floyd entering incorrect data into the UNOS data base and multiple instances where she altered patient records.  In response to her grievance, Pierson stated that it was clear that Floyd participated in the "alteration of patient medical records" and that there were "several alterations found."  Finally, Forrest's letter to the ASBN stated that Floyd was terminated for "intentionally altering patient medical records."  Plaintiff argues that Defendants changed the reason for her termination to "cutting and pasting" medical records.  The Court finds that the Defendant consistently articulated that the reason for Plaintiff's termination was the alteration of patient records.  Nevertheless, any reference to "cutting and pasting" as it relates to the alteration of the records does not rise to the level of "shifting explanations" sufficient to give rise to an inference of pretext. *See E.E.O.C v. Trans States Airlines, Inc*., 462 F.3d 987, 995 (8th Cir. 2006)(noting that the change in position must be substantial to equate to a "shifting

explanation" giving rise to an inference of pretext).

The Court finds that Floyd has failed to demonstrate pretext.  Accordingly, Plaintiff's claims for gender discrimination fail.

Defamation

Having granted the summary judgment motion on all federal law claims, we decline to retain jurisdiction on this state law claim. 28 U.S.C. § 1367(c)(3).

Conclusion

For these reasons, Defendants' motion for judgment on the pleadings, docket # 11, is GRANTED IN PART AND DENIED IN PART; Defendants' motion for summary judgment, docket # 33 is GRANTED; and, Defendants' second motion for summary judgment on requested relief and official capacity claims, docket # 40, is DENIED AS MOOT.

IT IS SO ORDERED this 16th  day of March, 2012.


James M. Moody
United States District Judge